UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN HARDY,

      Plaintiff,      Case No. 2:06-CV-12331
v.      Judge Avern Cohn

THE REYNOLDS AND REYNOLDS
COMPANY, a foreign corporation,

    Defendant,

_____/

## OPINION AND ORDER GRANTING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

### I. Introduction

  This is a suit for sales commissions. Defendant Reynolds and Reynolds Company ("Reynolds") hired Plaintiff John Hardy ("Hardy") in December 2004 as an Account Executive assigned to its General Motors ("GM") account. At the time of his hiring, Hardy signed a "Sales Representative and Associate Agreement" that provided for payment of sales commissions to Hardy in accordance with a compensation plan promulgated by Reynolds. These commissions were in addition to an initial base salary of $110,000 per year as well as other variable pay elements. In December 2005, Reynolds secured a sales contract with GM that was expected to generate over $200 million in sales. Hardy was one of many Reynolds employees who devoted substantial efforts toward securing the contract. Hardy did not originate the negotiations between Reynolds and GM (they began before he was hired at Reynolds), was not the project leader on the contract at Reynolds, and did not participate directly in the final

1

negotiations. In January 2006, Reynolds informed Hardy that he would not receive a commission for his work on the contract. Rather, he would receive a special bonus of approximately $43,000 in cash and stock. In May 2006, Hardy filed suit to recover the sales commission he claims is due to him under the compensation plan.

Before the Court is Reynolds's Motion for Summary Judgment. For the reasons that follow, the motion is GRANTED and the case is DISMISSED.

## II. Facts

The material facts, which are not in dispute and over which there is no serious issue, follow.

### A. Plaintiff's Employment with Defendant

Reynolds sells information technology and software tailored to automobile dealerships, and offers professional services to dealerships in support of automotive retailing. Reynolds directs most of its sales activities toward auto dealers; it also sells products directly to original equipment manufacturers ("OEMs") and seeks "endorsements" from OEMs that assist in its sales to dealers.

On October 28, 2004, Reynolds offered Hardy a position as an "Account Executive responsible for the GM relationship." The offer letter provided that Hardy would receive an annual base salary of $110,000 and that he would be eligible for a "variable pay element that will be reviewed in greater detail by your manager." Hardy accepted the position and began work in early December 2004.

Prior to his hire, on November 1, 2004, Hardy signed a "Sales Representative and Associate Agreement." This agreement provided that Hardy would be "entitled to

compensation according to the formula, method or system described in the then-current compensation plan...as such plan may change from time to time." During the first month of his employment, Reynolds provided Hardy with a copy of the Sales Compensation Plan for OEM Solutions Account Executives for fiscal year 2005. The Sales Contract portion of the Plan, at issue in this case, provided a formula for calculating the sales commissions to which Account Executives were entitled and noted that payments would be "[b]ased on INDIVIDUAL performance." (Capitalization in original.)

On its intranet site available to all employees, Reynolds also maintained a document titled "Sales Representative 2005 Compensation Plans United States." For fiscal year 2006, Reynolds maintained a similar document titled "2006 Compensation Plan Summary." Reynolds argues that these plans applied to Hardy based on the express provisions of the Sales Representative and Associate Agreement. Hardy argues that these documents applied only Reynolds's retail sales force, which sells to individual dealers, and not to OEM Account Executives. These documents provided that "[a]ny requests for adjustments to a sales representative's compensation or credit must be submitted in writing...within 90 days." The documents further stated that "[b]ecause of unusual circumstances or any other condition, Sales Management and/or Sales Compensation Management reserve the right to suspend or change the application of this compensation plan in selected individual situations. This means, in some cases, compensation may be arbitrarily determined without regard for the specific details of this plan."

### B. The GM-IDMS Contract

On December 15, 2005, Reynolds and GM executed a contract known as the GM-IDMS contract. This contract gave Reynolds the exclusive right to provide all Saturn dealerships in the United States with an Information Dealership Management System ("IDMS") and provided that Reynolds was one a of a small number of approved IDMS providers for all other GM dealerships in the United States.

The process of negotiating the contract began on September 17, 2004, more than two months before Hardy began work with Reynolds, when GM submitted to Reynolds a Request for Information ("RFI") for a new, comprehensive IDMS. A team of Reynolds employees prepared a written response to the RFI that was submitted to GM on October 14, 2004. Hardy began working on the GM-IDMS project soon after joining Reynolds in December. Specifically, Hardy was instructed to become familiar with the RFI and Reynolds's response and began attempting to schedule meetings between GM and Reynolds personnel. At this time, Hardy was told that another Reynolds employee, Cathy Orrico ("Orrico"), was leading the GM-IDMS project.

In January 2005, GM submitted a formal Request for Proposal ("RFP") to Reynolds. After Reynolds received the RFP, Orrico created a team of employees to craft Reynolds's written response. Hardy did not participate in creating the team and was not given any of the assignments related to Reynolds's response to the RFP that were set forth in writing. However, Hardy says that he provided information for some of the responses to the RFP and directed other Reynolds employees to do the same. Hardy says that at this stage he spent approximately 80-90% of his working time on the GM-IDMS project. In February 2005, Orrico designated him as "the single point of contact for clarification questions [from GM] on the Reynolds and Reynolds response [to

the RFP]." In late February and early March, a group of Reynolds employees held regular daily conference calls to discuss the response to the RFP in which Hardy was not invited to participate. Hardy was also not invited to Reynolds's final RFP response review meeting on March 11, 2005. Reynolds submitted the RFP response to GM on March 15, 2005.

GM ultimately selected Reynolds to provide the IDMS and the matter proceeded to contract negotiations in the fall of 2005. Orrico formed a negotiation team to reach a final agreement on the contract. Hardy was not a member of the team and did not participate directly in the negotiations, though he continued to participate in communications between GM and Reynolds and to gather information to be used in the negotiation process.

Reynolds and GM signed the GM-IDMS contract on December 15, 2005. The contract gave Reynolds the exclusive right to provide IDMS software and other services to all Saturn dealerships in the United States. In addition, GM "endorsed" Reynolds products for use in other GM dealerships. In a GM document describing how the contract would be implemented, Hardy was listed among the "key personnel" at Reynolds.

### C. Plaintiff's Compensation for the GM-IDMS Contract

On January 3, 2006, Orrico sent an email to Gary Crooks, Reynolds's Direction of Compensation and Benefits ("Crooks"), regarding compensation due to her, Hardy, and another Reynolds employee, Hardy's supervisor Lance Tebay ("Tebay"):

> Carrol has scheduled a meeting for us tomorrow at 5 pm to discuss sales compensation for the Saturn contract. The contract is 7 years/$260 million. I would like you to do me a

> favor and run a comp sheet for Orrico/Tebay/Hardy at the
> current pay plan.  Let's use this for the basis of the
> conversation tomorrow.  I realize the number will be
> outrageous so don't panic.  I just want to use it for a
> comparison...John Hardy contributed much less to the sale
> then [sic] Orrico/Tebay so I want it adjusted accordingly.

Crooks calculated that if the formula provided in the compensation plan applied to the GM-IDMS contract, Hardy would entitled to $2.3 million.

In an affidavit, Orrico states that Hardy was not entitled to the amount due under the formula because he played only a minor role in securing the GM-IDMS contract and because Reynolds reserved the right in its sales policies not to follow the formula on this type of unusual, large deal.   A document describing Hardy's personal sales objectives, prepared and signed by Hardy and Tebay in November 2005, set a goal of $5 million in sales for fiscal year 2006.  Hardy and Tebay were aware that the GM-IDMS contract, which at that time was in the final stages of negotiation, involved a great deal more than $5 million.  It is therefore clear that Hardy and Tebay did not intend that the GM-IDMS contract be included in Hardy's sales quota.

On January 9, 2006, Hardy attended a meeting with Reynolds's Senior Vice President of Sales and Service, Terri Mulcahey ("Mulcahey").  At the meeting, Mulcahey informed Hardy that he was one of seven employees to whom a special bonus would be awarded in light of the GM-IDMS contract.  In her affidavit, Orrico says that Hardy was awarded this bonus not because of his role in securing the contract, which was minimal, "but because of the importance his role would have in the importance of the GM-IDMS launch."  Mulcahey presented Hardy with a form letter, given to all seven employees, thanking him for his "hard work and extra effort."  The letter stated that "[s]ince deals

6

this large are unanticipated when establishing your annual compensation plan, no credit will be provided through your standard compensation program." Instead, the letter notified Hardy that he would receive a special one-time bonus of cash and stock worth approximately $43,000. The letter stated that the bonus was "intended to reward you for your outstanding efforts." Hardy called Tebay to protest the fact that he was not being paid under the compensation plan, but did not object in writing. Approximately one week later, Orrico informed Hardy that he would not receive any payment under the compensation plan for his work on the GM-IDMS contract.[1]

Hardy filed this lawsuit on May 23, 2006, seeking to recover payment under the compensation plan for his work on the GM-IDMS contract. However, he continued his employment at Reynolds until voluntarily leaving the company in February 2007.

### III. Legal Standard

Summary judgment will be granted when the moving party demonstrates that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The nonmoving party may not rest upon his pleadings; rather, the nonmoving party's response "must set forth specific facts showing that there is a genuine issue for

---

[1] At oral argument, Reynolds' counsel stated that no one at Reynolds received a percentage commission on the GM-IDMS contract. There is nothing in the record to contradict this statement.

trial." FED. R. CIV. P. 56(e). Showing that there is some metaphysical doubt as to the material facts is not enough; "the mere existence of a scintilla of evidence" in support of the nonmoving party is not sufficient to show a genuine issue of material fact. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). Rather, the nonmoving party must present "significant probative evidence" in support of its opposition to the motion for summary judgment in order to defeat the motion. See Moore v. Philip Morris Co., 8 F.3d 335, 340 (6th Cir. 1993); see also Anderson, 477 U.S. at 249-50. Additionally, and significantly, "affidavits containing mere conclusions have no probative value" in summary judgment proceedings. Bsharah v. Eltra Corp., 394 F.2d 502, 503 (6th Cir. 1968).

The Court must decide "whether the evidence presents a sufficient disagreement to require submission to a [trier of fact] or whether it is so one-sided that one party must prevail as a matter of law." In re Dollar Corp., 25 F.3d 1320, 1323 (6th Cir. 1994) (quoting Anderson, 477 U.S. at 251-52). The Court "must view the evidence in the light most favorable to the non-moving party." Employers Ins. of Wausau v. Petroleum Specialties, Inc., 69 F.3d 98, 101 (6th Cir. 1995). Determining credibility, weighing evidence, and drawing reasonable inferences are left to the trier of fact. See Anderson, 477 U.S. at 255. Only where there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law may summary judgment be granted. Thompson v. Ashe, 250 F.3d 399, 405 (6th Cir. 2001).

## IV. Discussion

The obligations of the parties to a sales agency agreement are primarily governed by the terms of the contract. "[W]hether an agent or broker...is entitled to

commissions on sales made or consummated by his principal or by another depends upon the intention of the parties and the interpretation of the contract of employment, and that, as in other cases involving interpretation, all the circumstances must be considered." Reed v. Kurdziel, 352 Mich. 287, 294 (1958), quoting Anno, Agent-Commission on Sale by Another, 12 A.L.R.2d 1360, 1363 (1949).

In this case, the contract consists of at least two documents, and possibly more. First, Hardy signed a "Sales Representative and Associate Agreement" before he began work, in November 2004. This agreement provides that Hardy "shall be entitled to compensation according to the formula, method or system described in the then-current compensation plan." The parties agree that the applicable compensation plan is Reynolds's fiscal year 2006 Sales Compensation Plan for OEM Solutions Account Executives. The "Sales Contracts" portion of the compensation plan states that commissions will be made for sales contracts "based on INDIVIDUAL performance." The parties agree that this is the only language that speaks directly to the issue of which contracts entitle Hardy to a commission; nowhere is the phrase "based on INDIVIDUAL performance" further explained.

Reynolds argues that the contract includes, in addition, Reynolds' "2006 Compensation Plan Summary," or at least certain portions thereof. Specifically, Reynolds points to the "General Rules" section of that document, which states that Reynolds may unilaterally alter the compensation plan and that objections to compensation decisions must be made in writing within 90 days. Hardy argues that these provisions were aimed at classes of employees other than OEM Account

Executives and therefore do not apply to him. The Court finds it unnecessary to resolve this dispute.

### A. Plaintiff Did Not Have an Exclusive Right to Sell Agreement with Plaintiff

As an initial point, the Court notes that there is nothing in the contract that gave Hardy an *exclusive* right to sell to GM. "[A]n intent to give an agent an exclusive right to sell must appear from the unequivocal terms of the agreement or by necessary implication." Roberts Assocs., Inc. v. Blazer Int'l Corp., 741 F. Supp. 650, 656 (E.D. Mich. 1990), citing 3 Am. Jur. 2d, Agency, § 268, at 768-69 (1986). In this case, the contract contains no language that may be construed to this effect. If the parties had agreed that Hardy would have the right to a commission on any sale made to GM, they could have explicitly so stated. Roberts, 741 F. Supp. at 656.

Hardy does not directly advance an argument for an exclusive right to sell, but emphasizes in his brief that he was the only Reynolds Account Executive assigned to GM. However, the fact that there were no other Account Executives assigned to GM means neither that Reynolds was forbidden from soliciting GM business itself nor that Hardy was entitled to a sales commission on every sale made to GM. "It is well-settled that where a principal enters into a non-exclusive representation agreement with an agent, he is not thereby precluded from competing with the agent personally or through another agent." Id. at 652, citing Restatement (Second) Agency, § 449. Accordingly, Hardy is entitled to a commission only if he met the condition specified in the compensation plan, i.e., only if Reynolds secured the GM-IDMS contract "based on [his] INDIVIDUAL performance."

## B. Defendant's Procurement of the GM-IDMS Contract Was Not Based on Plaintiff's Individual Performance

The parties agree that the only contractual language that addresses the issue of the circumstances under which Hardy is entitled to a commission is the phrase "based on INDIVIDUAL performance." The remainder of the "Sales Contracts" portion of the compensation plan addresses only how the dollar amount of commissions is to be calculated. There is no further explanation, in the compensation plan or elsewhere, of what is meant by "based on INDIVIDUAL performance."

Though the language is sparse, the compensation plan does explicitly define the extent of Reynolds's responsibility to pay sales commissions. Michigan's "procuring cause" doctrine is therefore inapplicable. As this Court has said before, see Roberts, 741 F. Supp. at 652, the procuring cause doctrine is triggered only "where the contract is silent." See also Clark Bros. Sales Co. v. Dana Corp., 77 F.Supp.2d 837, 847-49 (E.D. Mich. 1999). In this case, the parties expressly set down the conditions under which Hardy is entitled to a sales commission in a written agreement, so the Court's inquiry must begin with the language of the agreement itself, guided by certain basic tenets of Michigan contract law.

"The primary goal in the construction or interpretation of any contract is to honor the intent of the parties." Rasheed v. Chrysler Corp., 445 Mich. 109, 127 n.28 (1994). Where possible, this intent must be ascertained "through the words used in the instrument," as the Court "does not have the right to make a different contract for the parties or to look to extrinsic testimony to determine their intent when the words used by

11

them are clear and unambiguous and have a definite meaning." Sheldoz-Seatz, Inc. v. Coles, 319 Mich. 401, 406-07 (1947). The Court must interpret words used in the contract "in accordance with their commonly used meanings." Henderson v. State Farm Cas. Co., 460 Mich 348, 354 (1999). The contract must be "construed so as to give effect to every word or phrase so far as practicable." Hunter v. Pearl Assurance Co., 292 Mich. 543, 545 (1940).

The initial determination whether contract language is ambiguous is a question of law. Port Huron Educ. Ass'n v. Port Huron Area Sch. Dist., 452 Mich. 309, 323 (1996). If the language is unambiguous, the meaning of the contract is likewise a question of law for the Court to decide. Id. The contract's meaning must be decided by the trier of fact only "[w]here the contract language is unclear or susceptible to multiple meanings." Id. However, the Court must take care not to "create ambiguity where none exists." Smith v. Physicians Health Plan, Inc., 444 Mich. 743, 759 (1994). "If a contract, however inartfully worded or clumsily arranged, admits of but one interpretation, it may not be said to be ambiguous." Lentz v. Lentz, 271 Mich. App. 465, 472 n.3 (2006).

The ordinary meaning of the words "based on INDIVIDUAL performance" appears to prescribe a standard similar to the "procuring cause" test. For example, Webster's defines "individual" as "of, relating to, or distinctly associated with an individual." It further defines base as "the fundamental part of something: groundwork" and the transitive verb "to base" as "to make, form, or serve as a base for." Webster's Ninth New Collegiate Dictionary (1985). The ordinary meaning of the words thus seems to refer to sales that, while perhaps not *exclusively* the result of an individual's efforts, in large part result from or are founded on such efforts.

12

This reading accords with two well-established rules of contract construction. First, under the maxim "*expressio unius est exclusio alterius*," Zynda v. Mich. Aeronautics Comm'n, 372 Mich. 285, 287 (1964), Reynolds's express promise to pay commissions for sales "based on INDIVIDUAL efforts" excludes any implied promise to pay other sorts of commissions, such as commissions on sales that were made mostly due to the efforts of other individuals. This point is particularly strong given the contract's emphasis on the term "INDIVIDUAL." Second, to read the language as Hardy suggests, that is to permit commissions on sales that are due mostly to the efforts of other individuals, essentially reads the language out of the contract, reducing it to mere surplusage. See Hunter, 292 Mich. at 545. In addition, the Court is loath to adopt an interpretation of the compensation plan that would compensate Account Executives in a manner disproportionate to their efforts or business value to Reynolds. See Roberts, 741 F. Supp. At 657.

In this case, it cannot be fairly said that Reynolds secured the GM-IDMS "based on [Hardy's] INDIVIDUAL performance." The parties agree on the essential facts at issue. First, the opportunity to win the contract originated well before Hardy began working at Reynolds, when GM submitted its RFI to Reynolds. Orrico led a team of Reynolds employees in crafting a response to the RFI, and the response was completed and submitted to GM before Hardy began work.

After beginning his employment at Reynolds, Hardy spent most of his time working on the GM-IDMS deal. However, Hardy's bare assertion that he was the "de facto lead" on the project and believed that he was entitled to a commission is unavailing. Michigan follows the objective theory of contracts, and accordingly Hardy's

13

subjective intent or belief is irrelevant. Lilley v. BTM Corp., 958 F.2d 751-52 (6th Cir. 1992). In any event, Hardy's claims are belied by the documentary evidence, which demonstrates that Hardy was not among the Reynolds employees responsible for coordinating the response to the RFP, was not invited to participate in daily conference calls or important meetings related to the project, and was not a member of the Reynolds negotiation team that ultimately secured the contract. Hardy himself seemed to concede that the GM-IDMS deal depended largely on the efforts of other Reynolds employees in an employment evaluation prepared in the fall of 2006, months after Reynolds and GM had begun to implement the contract. In that document, Hardy lists as a potential area of improvement "transition[ing] GM-IDMS executive relationship reliance from the OEM VP and Director to myself."

While the contractual language is clear enough that resort to extrinsic evidence is unnecessary to aid in construction, the Court notes that the parties' conduct lends support to its reading. In the fall of 2005, when the GM-IDMS contract was in final negotiations, Hardy and Tebay prepared and signed a document that set a goal of $5 million for Hardy's sales in fiscal year 2006. Because at that time the GM-IDMS contract was known to be a great deal larger than $5 million, both Hardy and Tebay obviously believed that the contract was not to be included among Hardy's personal sales goals. The same understanding is also reflected in an evaluation prepared around the same time, in which Hardy lists among his personal goals for 2006 "building and sustaining a pipeline of new business four times my annual new sales quota." Given the $5 million quota, this translates to a goal of $20 million, again demonstrating that Hardy did not consider the GM-IDMS contract to be among his personal sales.

Terri Mulcahey, the Reynolds Senior Vice President of Sales and Service, stated in her deposition that it was the company's practice to "pay people for what they sell...it means that you were the person who went out and got the business." Gary Crooks, the Director of Compensation and Benefits, said that commissions are earned only where the Account Executive "is the one responsible for getting the business, going through the entire sales process, then closing the business." Orrico stated in her deposition that where other Reynolds employees brought large deals to completion, Account Executives and sales representatives were not paid commissions.

The Court does not doubt that Hardy contributed substantial efforts and made a contribution to the overall undertaking at Reynolds to secure the GM-IDMS contract. In light of the record, however, it cannot be said that Reynolds secured the GM-IDMS contract "based on [Hardy's] INDIVIDUAL performance" under any reasonable construction of that phrase. More than that, to award Hardy a commission of more than $2 million on the contract under the undisputed circumstances of its procurement would be a windfall to him. Reynolds is therefore entitled to summary judgment on the breach of contract claim.

## V. Conclusion

Reynolds urges that it is entitled to summary judgment for the additional reasons that Reynolds reserved the right to alter the compensation plan and that Hardy failed to object in writing within 90 days to Reynolds' refusal to pay him a percentage commission. The Court finds it unnecessary to reach these arguments.

Hardy's claim for breach of the Michigan Sales Representative Commission Act is essentially derivative of his breach of contract claim. For the reasons stated above, Reynolds is entitled to summary judgment on this claim as well.

SO ORDERED.

          s/Avern Cohn
          AVERN COHN
          UNITED STATES DISTRICT JUDGE

Dated: September 17, 2007

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, September 17, 2007, by electronic and/or ordinary mail.

          s/Julie Owens
          Case Manager, (313) 234-5160